842 F.2d 1186
 Ronald Wayne EVERAARD, Executor of the Estate of Carolyn Sue
Autery, deceased, Plaintiff-Appellant, Cross-Appellee,
v.
HARTFORD ACCIDENT AND INDEMNITY CO., a corporation,
Defendant-Appellee, Cross-Appellant.
Oklahoma Association of Defense Counsel, Amicus Curiae.
 Nos. 85-2751, 85-2752.
 United States Court of Appeals,
Tenth Circuit.
 March 24, 1988.
 
 David Kline and Delmer L. Stagner of Kline & Kline, Oklahoma City, Okl., for plaintiff-appellant, cross-appellee.
 Dan A. Rogers of Rogers, Honn & Associates, Tulsa, Okl. (Edwin F. Garrison of Looney, Nichols, Johnson & Hayes, Oklahoma City, Okl., with him on the briefs), for defendant-appellee, cross-appellant.
 James A. Knox, Jr., Oklahoma City, Okl., on the brief, for amicus curiae.
 Before HOLLOWAY, MOORE and TACHA, Circuit Judges.
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 This case focuses on the question whether an insurer who provides uninsured motorist coverage pursuant to Oklahoma law has a primary duty to its insured under the policy when only one of the negligent parties involved in the covered incident is uninsured. Hartford Accident and Indemnity Company (Hartford) urges the question is one of first impression for the State of Oklahoma, justifying its refusal to pay and negating a finding of bad faith made by the trial court in this case. We disagree, but finding an incomplete record, we remand for a judicial articulation of certain factual findings and an appropriate determination of damages.
 
 I.
 
 2
 This action arises out of a three-car collision near Austin, Texas, on March 23, 1984. Carolyn Sue Autery was a passenger in a car driven by Cathleen Combies. While the Combies car traveled in the far right-hand lane of a three lane highway, a second car driven by Jessie Nancy Zapata abruptly changed lanes, cutting in front of Ms. Combies' car and braking to exit the highway. Unable to stop or properly slow her car, Ms. Combies ran into Ms. Zapata's vehicle, propelling the Combies automobile into the far inside lane. After Ms. Combies' car came to rest, Ms. Autery emerged but was instantly struck and killed by a pickup truck driven by John Nolen Crites.
 
 
 3
 The executor of Ms. Autery's estate, her brother, Ronald Wayne Everaard, notified Hartford of his intention to claim the aggregate limits of the decedent's Oklahoma uninsured motorist policy (the UM policy) on behalf of Ms. Autery's two children. On the basis of information received from counsel appointed in Texas, Mr. Everaard informed Hartford that Ms. Zapata's negligence caused the accident and consequent fatality and that Ms. Zapata was an uninsured motorist. However, Hartford refused to pay the $600,000 UM policy limits.
 
 
 4
 Subsequently, in the United States District Court for the Western District of Oklahoma, Mr. Everaard filed an action to recover on the UM policy and for the tort of the insurer's bad faith in failing to pay the proceeds of the policy. He alleged damages of $900,000 for loss of future income expectancy, $600,000 for the children's loss of care and maintenance, $1,000,000 for loss of comfort and companionship, and $1,000,000 for the grief and loss suffered by the decedent's parents. In addition, alleging that Hartford had knowingly and willfully refused to process this claim in good faith, Mr. Everaard sought $1,200,000 in exemplary damages.
 
 
 5
 Hartford defended the action on the grounds that none of the vehicles involved in the accident was underinsured; that plaintiff could not sue Hartford without joining all of the alleged tortfeasors or first obtaining a judgment against the insured tortfeasors; and that its liability was contingent on the combined limits of the underlying liability coverage. The district court denied Hartford's motion to dismiss and for change of venue, and a bench trial followed.
 
 
 6
 The parties stipulated to the existence and amounts of liability insurance held by Ms. Combies and Mr. Crites[1] and to Ms. Zapata's lack of any insurance. Further, the parties stipulated that Ms. Autery's death was proximately caused by the negligence of Ms. Combies, Mr. Crites, or Ms. Zapata singly or jointly. Hartford vigorously cross-examined plaintiff's witnesses[2] to establish its theory that until plaintiff filed suit in Texas to determine liability, Hartford had no duty to perform its uninsured motorist contract.[3] Adopting verbatim proposed findings of fact and conclusions of law submitted by the plaintiff, the district court rendered judgment for Mr. Everaard awarding $600,000 contract damages, $165,000 compensatory damages, and $900,000 exemplary damages, as well as costs of the action. Interest of 7.87% was set on the judgment.
 
 
 7
 Hartford now complains that the evidence was insufficient to support the finding of bad faith which premised the award of punitive damages and that the conclusions of law are incomplete, inconsistent, and consequently erroneous. At the core of Hartford's appeal is its contention that UM coverage is excess and thus recoverable only after all available liability insurance has been depleted. Translated into the present action, this theory requires the executor to file suit in Texas to establish liability and attempt to share in the available liability coverage of two of the tortfeasors before making a claim against the Hartford UM policy. In a cross-appeal, Mr. Everaard asserts the district court erred in applying the federal postjudgment interest rate of 7.87% under 28 U.S.C. Sec. 1961 instead of the state interest rate of 15% per annum specified in Okla.Stat. tit. 12, Sec. 727 (1981).
 
 II.
 A.
 
 8
 At the outset, we note that resolution of Hartford's appeal turns on our interpretation of Oklahoma's uninsured motorist statute (UM statute), Okla.Stat. tit. 36, Sec. 3636 (1979).[4] While we are reluctant to foray onto this battleground,[5] Oklahoma has provided some guidance. As we proceed, we recognize our obligation to apply state law as announced by the highest court of the state, Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967), and in its absence "to regard ourselves as sitting in diversity and predicting how the state's highest court would rule." Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir.1984). In this instance, our role as prognosticator, however, does not simply that our decision interpreting state law is less than final. "Of all the duties of an appellate court, one of the most important is to settle matters before it, not only for the benefit of the parties to the suit but also for the guidance of the public and the trial courts." Rhody v. State Farm Mut. Ins. Co., 771 F.2d 1416, 1421 (10th Cir.1985) (McKay, J. concurring).
 
 
 9
 This litigation fulfills the prophesy that although UM coverages were initiated as voluntary proposals of the insurance industry to satisfy a perceived public need, their proliferation has enhanced the occasions that pit insurers against their policyholders to protect their opposing interests. See Appleman, Insurance Law and Practice Sec. 5066 (1981). We would further predicate our discussion on the recognition that forty-nine states have enacted mandated UM coverage evidencing the force of public policy in support of these benefits. Indeed, in such jurisdictions, fair and equitable dealing by the UM insurer is implied in law. See 2 Widiss, Uninsured and Underinsured Motorist Insurance Secs. 2, 20.3 (2d ed. 1987) [hereinafter Widiss].
 
 
 10
 Given this setting, we are somewhat hesitant to adopt Hartford's characterization of the pivotal issue of this appeal as one of first impression. While we are called upon to determine the proper sequencing of payment obligations between the insurer and its insured under an UM policy, we are satisfied that Oklahoma law furnishes the necessary guidelines.
 
 
 11
 In Oklahoma, UM coverage is included in every policy of automobile liability insurance issued in the state unless the insured has rejected this coverage in writing. Okla.Stat. tit. 36, Sec. 3636(F). Section 3636(A) provides:
 
 
 12
 No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be issued, delivered, renewed, or extended in this state with respect to a motor vehicle registered or principally garaged in this state unless the policy includes the coverage described in subsection (B) of this section.
 
 
 13
 Subsection (B) sets forth the prerequisites to recovery. To recover under a UM policy, the insured must be (1) legally entitled to recover damages,[6] (2) from owners and operators of uninsured motor vehicles, (3) because of bodily injury ... including death. Okla.Stat. tit. 36, Sec. 3636(B). Minimum coverage is mandated.[7] As the Oklahoma Supreme Court has noted: "The literal import of the statute leaves no doubt.... The statute grants the victim prima facie recourse to any and all policies available, subject to the implicit condition that [the] claims in aggregate not exceed [the] damages." Keel v. MFA Ins. Co., 553 P.2d 153, 155 (Okla.1976).
 
 
 14
 Hence, in Oklahoma, contrary to the position asserted by Hartford, UM insurance is primary coverage from the insurer to its policyholder. Such coverage creates an expectation that the policy limits are available to the insured when the tortfeasor is uninsured and damages are proved. The Oklahoma Supreme Court has stated in Uptegraft, 662 P.2d at 683-84, "The purpose of an uninsured motorist provision in an insurance contract is to protect the insured from the effects of personal injury resulting from an accident with another motorist who carries no insurance or is underinsured." (Emphasis added.) The Uptegraft court correctly noted that UM insurance is not liability insurance. "It does not undertake to protect the insured against liability he may incur to others but rather compensates him for a loss caused by a specific class of tortfeasors." Id. at 685, n. 6. Thus, Sec. 3636 is predicated on a policy of indemnification which asks only "what [is] the [insured's] coverage under the policy when considered in connection with our uninsured motorist statute." Richardson v. Allstate Ins. Co., 619 P.2d 594, 596 (Okla.1980).
 
 
 15
 The Oklahoma Supreme Court has delineated several means by which the insured may claim the UM coverage. Among these options, an insured may "file an action directly against his insurance company without joining the uninsured motorist as a party defendant and litigate all of the issues of liability and damages in that one action." Keel, 553 P.2d at 158 (citation omitted). Section 3636 does not require the adjudication of tort claims against the uninsured motorist as a prerequisite to recovery.[8] In our case, no language in Sec. 3636 or Keel implies that the presence of other insured or underinsured tortfeasors alters this sequence.
 
 
 16
 Given this statutory predicate, Hartford's contention that it owes nothing on the Autery UM policy until all underlying coverage is exhausted is meritless. While Sec. 3636(C) provides that UM coverage may function as underinsured motorist coverage when available liability limits are less than the amount claimed, neither the statute nor the relevant case law mandates this sequencing.[9] More importantly, subsection (C) was not intended to be exclusive, subsuming the language of sections (A) and (B). Indeed, an insured with damages far in excess of UM policy limits may choose to litigate a claim joining all tortfeasors, insured and uninsured, to recover damages from the available third-party liability insurance.[10] Nevertheless, this sequencing is not exclusive, as Hartford would suggest, but evidences only the collateral role of UM coverage as excess insurance in certain situations.
 
 
 17
 Thus, we hold that Okla.Stat. tit. 36, Sec. 3636, permits the holder of an UM policy to bring a direct action against its insurer upon the satisfaction of the conditions in subsection (B). While this sequencing is not exclusive, it is a permissible option when the limits of the UM coverage are sufficient to satisfy the claimant's proved damages.
 
 B.
 
 18
 With the resolution of this central issue, we may discard two of Hartford's other arguments and better evaluate the claim of bad faith. First, Hartford urges that tortfeasors with available liability coverage are indispensable parties to an action on an UM policy.[11] The preceding discussion of Oklahoma law lays this contention to rest. Equally as vacuous is Hartford's argument the district court abused its discretion in denying its motion to transfer venue to the Western District of Texas.[12] The district court properly applied Keel in hearing the Everaard action.
 
 
 19
 Second, Hartford contests the district court's finding Ms. Zapata negligent, urging that because this finding is based on deposition testimony, it carries less weight on appellate review. Hartford had stipulated to Ms. Zapata's negligence as well as the negligence of Ms. Combies and Mr. Crites. The deposition testimony tends to confirm the stipulation and supports the district court's finding. Moreover, "Rule 52(a) does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (citation omitted). Having reviewed the relevant deposition testimony, we are not "left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 20
 We are similarly unpersuaded to reconsider the district court's rejection of Hartford's evidence of Ms. Autery's alleged negligence in choosing to ride with a driver who had consumed alcohol before driving the vehicle. Initially, without even the inclusion of the pretrial order in the record, we are unable to determine whether the issue was before the trial court. Fed.R.Civ.P. 16.[13] Nor are we able to evaluate the existing scant testimony composed mainly of conjecture and surmise elicited by Hartford. In any event, we find nothing in the record to satisfy us that Ms. Autery's negligence was even a contested factual issue the trial court was called upon to determine.
 
 III.
 
 21
 Hartford next advances the theory that because Ms. Autery was killed in a non-owned vehicle, Hartford's coverage is governed by the "other applicable similar insurance" clause in its policy and is "excess over any other collectible insurance." (Emphasis added.) Keel has laid this argument to rest as well. "The [Oklahoma] legislature could have limited protection to the minimum statutory limit had that been its intent or could have restricted coverage to only one policy. Since it did not, there appears to be no latitude in the statute for an insurer limiting its liability through 'other insurance clauses.' " Keel, 553 P.2d at 156 (citation omitted); accord Richardson, 619 P.2d at 594. While other insurance clauses may be helpful in determining priority of payment when more than one UM policy is involved and the judgment exceeds the coverage under the policies, the Oklahoma Supreme Court has invalidated these clauses when their effect is to limit contractual liability legitimately contemplated by the insured by the payment of premiums. More importantly, "[u]ninsured motorist coverage is not dependent on the insured occupying a vehicle named in the policy." Richardson, 619 P.2d at 597. In our recent decision in Russell v. American States Ins. Co., 813 F.2d 306, 311 (10th Cir.1987), in which we invalidated a policy exclusion under Sec. 3636(C), we reiterated the Oklahoma court's position that "once a person is insured under an uninsured motorist policy, subsequent exclusions inserted by the insurer in the policy which dilute and impermissibly limit uninsured motorist coverage are void as violative of the public policy espoused by 36 Okla.Stat.1981 Sec. 3636." (Citations omitted.) Hartford misrepresents the import of Keel in its discussion of this contention, and its citation of Smith v. Government Employees Ins. Co., 558 P.2d 1160 (Okla.1976),[14] is inapposite.
 
 
 22
 Absent in Hartford's analysis is the essential fact that its obligation to its insured under the UM policy is primary. Once this obligation is met, Hartford may rely on the other insurance clause to seek subrogation or indemnification from the other available liability insurance. However, Hartford's insistence that the only system of priority is that which forces the insured into litigation to first exhaust all available coverage remains misplaced.[15]
 
 IV.
 
 23
 The district court awarded $900,000 in exemplary damages, finding that Hartford's pretrial negotiation tactics amounted to "malice in law if not in fact." Hartford insists the evidence was insufficient to support a claim for its bad faith breach of the UM policy and takes issue with both the substance of the court's findings and its procedure. Hartford posits the question as simple: Is an insurance company that litigates the issues of liability and damages when substantial liability insurance is still available to the insured guilty of bad faith?
 
 
 24
 The Oklahoma Supreme Court has asked the question a little differently. In Christian v. American Home Assur. Co., 577 P.2d 899, 900 (Okla.1978), the court decided the issue "whether under Oklahoma law an insurance company may be subjected to liability in tort for a willful, malicious and bad faith refusal to pay a valid insurance claim." The court reiterated that an insurer owes its insured an implied-in-law duty of good faith and fair dealing. Referencing Okla.Stat. tit. 36, Sec. 4405 A 8, which requires insurance companies make immediate payment of claims upon receipt of written proof of loss, the court reasoned that the legislature contemplated an insurance company assumed a greater obligation than the mere payment of money. The insurer has a duty to pay the policy amount immediately or to defend in good faith and to deal fairly with its insured. Id. at 904. While the Oklahoma court recognized the right of an insurance company to resist and litigate claims based on its reasonable belief that a "variety of matters" substantiate the disagreement, id. at 905, the court concluded that tort liability "may be imposed only where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured." Id. Resort to a judicial forum is not per se bad faith, the court cautioned. See also McCorkle v. Great Atlantic Ins. Co., 637 P.2d 583 (Okla.1981).
 
 
 25
 At this juncture, our review is stymied. The trial transcript contains conflicting testimony of several insurance experts, Messrs. Roberts and Travis, and Hartford's representative, Mr. Donaldson, who testified on the issue of whether Hartford's actions amount to bad faith. Nonetheless, the court's ultimate findings of fact and conclusions of law simply fail to articulate which of those specific actions the court believed amounted to bad faith within the Christian framework. Instead, the findings of fact are argumentative, adversarial, and emotional, and of no aid to our review.
 
 
 26
 We are concerned not only with the manner in which the court adopted critical documents submitted by plaintiff but also with the adequacy of the findings ultimately presented as the court's. Andre v. Bendix Corp., 774 F.2d 786 (7th Cir.1985). It cannot be gainsaid, "where the district court adopts a party's proposed findings of fact wholesale or verbatim, the resulting findings are 'not the original product of a disinterested mind.' " Id. at 800 (citations omitted). We have condemned this mechanical adoption of a litigant's findings as "an abandonment of the duty imposed on trial judges by Rule 52 F.R.Civ.P., because findings so made fail to 'reveal the discerning line for decision.' " Kelson v. United States, 503 F.2d 1291 (10th Cir.1974).
 
 
 27
 The Supreme Court has criticized courts "for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." Anderson v. City of Bessemer City, 470 U.S. at 572, 105 S.Ct. at 1510 (citations omitted). The Court, nonetheless, concluded that even in these situations, the clearly erroneous standard must still guide an appellate court's review.
 
 
 28
 More troublesome in the district court's outright adoption of the plaintiff's conclusions is the total absence of a reasoned analysis of how damages were awarded.[16] We agree with Hartford's contention that the district court's award of damages inexplicably confused compensatory and exemplary damages. At best, the order does not articulate the specific basis for the award of compensatory damages with any reference to the evidence. Similarly, although plaintiff's counsel offered proof of Hartford's net worth on which to assess an award of punitive damages, there is no indication in the findings of how the $900,000 figure was reached.
 
 
 29
 While we do not believe that the findings are so inadequate as to warrant a new trial, see 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2577 (1971), we simply cannot rely on them in their present form and fulfill our duty of appellate review. We must, therefore, remand this action for further findings based on the record to establish (1) those specific instances of the insurer's unreasonable conduct toward its insured within the framework of Christian and (2) the recalculation of the award of contract damages and an objective determination of such punitive damages the court's reasoned analysis proves appropriate.
 
 V.
 
 30
 Finally, cross-appellant, Mr. Everaard, contends the district court erred in awarding postjudgment interest based on the federal interest rate rather than the higher state rate authorized under Okla.Stat. tit. 12, Sec. 727 (1981). In its order, the district court held that the judgment would carry interest at 7.87% per annum, the 52-week Treasury bill yield as provided by 28 U.S.C. Sec. 1961 (1982). Mr. Everaard asserts that in its exercise of diversity jurisdiction, the district court should apply state law on postjudgment interest to a judgment decided wholly on state law.
 
 
 31
 Although this circuit has not yet addressed the issue, we are persuaded the federal statute governs. G.M. Brod & Co. v. U.S. Home Corp. 759 F.2d 1526, 1542 (11th Cir.1985); Weitz Co. v. MoKan Carpet, Inc., 723 F.2d 1382, 1387 (8th Cir.1983). After a reasoned analysis, each of these cases applied the federal postjudgment interest rate in diversity jurisdiction noting the congressional desire to establish a uniform rate applicable to money judgments recovered in federal court. We are unswayed by Mr. Everaard's argument to the contrary. Consequently, we hold the district court did not err in applying the federal postjudgment interest rate.
 
 
 32
 The judgment is AFFIRMED in part and REMANDED for further proceedings in accordance with this opinion.
 
 
 
 [1]
 Ms. Combies had coverage with State Farm Insurance Company for automobile liability insurance with limits of $25,000/$50,000; a policy with USAA with $300,000/$500,000 limits; and a $1,000,000 umbrella liability policy with USAA. Mr. Crites' automobile liability policy with American General Fire & Casualty Company provided a single limit of $300,000
 
 
 [2]
 At trial, counsel for plaintiff called members of Ms. Autery's family to testify about their relationship with her; an Oklahoma and a Texas attorney who specialize in insurance law; and an expert trained in economic evaluations of personal injury losses
 
 
 [3]
 In fact, Mr. Everaard had filed suit in Texas naming Ms. Combies, Mr. Crites, and Ms. Zapata as defendants, although no judgment had been rendered prior to the Oklahoma action. Additionally, Hartford had participated in settlement negotiations in Texas with representatives from the three other insurance carriers which had no effect on the subsequent Oklahoma trial. However, those negotiations depleted the available $1.85 million of liability coverage to $717,500 when Ms. Levenson, the second seriously injured passenger, settled her claim
 
 
 [4]
 It is uncontested that Ms. Autery's UM policy issued by Hartford was in effect on March 23, 1984. Thus, the plaintiff's rights are governed by this amended statute
 
 
 [5]
 For example, numerous cases have been certified to the Oklahoma Supreme Court from the District Court for the Western District of Oklahoma. See, e.g., Brown v. United Services Auto. Ass'n, 684 P.2d 1195 (Okla.1984); Uptegraft v. Home Ins. Co., 662 P.2d 681 (Okla.1983); Lake v. Wright, 657 P.2d 643 (Okla.1982); Richardson v. Allstate Ins. Co., 619 P.2d 594 (Okla.1980)
 
 
 [6]
 In Uptegraft, 662 P.2d at 685, the court stated, " 'Legally entitled to recover' simply mean[s] that the insured must be able to establish fault on the part of the uninsured motorist which gives rise to damages and prove the extent of those damages."
 
 
 [7]
 Subsection B incorporates by reference Okla.Stat. tit. 47, Sec. 7-204 which requires minimum $10,000/$20,000 coverage. The UM policy may exceed this minimum, "not to exceed the limits provided in the policy of bodily injury liability of the insured." Okla.Stat. tit. 36, Sec. 3636(B)
 
 
 [8]
 In contrast, for example, Georgia, South Carolina, Tennessee and Virginia require the insured first proceed against the uninsured tortfeasor and obtain a judgment as a condition precedent to recovery under a UM policy. See Widiss, Sec. 28.12, at p. 340
 
 
 [9]
 In fact, Hartford superimposes subsection (C) on all of Sec. 3636 to characterize the statute as "excess insurance." Contrary to Hartford's theory, Oklahoma did not "opt[ ] for an excess-type of statute" but adopted primary UM coverage which also provides for underinsured coverage. The amicus brief filed by the Oklahoma Association of Defense Counsel is equally unhelpful in characterizing UM coverage as "excess or secondary nature." While the condition precedent to recovery under Sec. 3636(C) is that the amount of the claim exceed the tortfeasor's liability limits, that contingency is not stated in Sec. 3636(A)
 
 
 [10]
 Keel includes this option but requires the insured give notice to his insurer if he is not made a party-defendant so that the insurer "can take whatever action they desire, including intervention." 553 P.2d at 158
 
 
 [11]
 Throughout its brief, Hartford refers to UM coverage as underinsured motorist coverage, an obfuscating characterization which, on the basis of the previous discussion, we reject
 
 
 [12]
 Indeed, the record includes testimony describing Hartford's refusal to remain in settlement negotiations in Texas involving the other victims, in which there was available $1.85 million in liability coverage, because it refused to permit the two other insurance companies involved to consider the UM policy limits when calculating the potential recoveries available
 
 
 [13]
 Counsel for Mr. Everaard complains that this theory of contributory negligence was advanced just prior to trial
 
 
 [14]
 Smith involved a garnishment action in which the insured settled with its insurer and then sought recovery from the tortfeasor's insurer. The court held that in the absence of Smith's performance of his insurer's condition precedent, he could not recover the excess insurance available
 
 
 [15]
 We note only in passing that both Hartford's and Mr. Everaard's references in the record to possible rights of subrogation are incomplete and undeveloped. Once again, however, it goes without saying that Hartford has no right to subrogation in the Texas action until it has paid a claim
 
 
 [16]
 The district court held that "the aggregate of [uninsured motorist] insurance [$600,000] and compensatory [$165,000] and exemplary [$900,000] damages awarded ... are less than the uncontradicted evidence of the plaintiff's damages and that there will be no apparent windfall to the plaintiff on account of such exemplary damage award."