**JTH TAX, INC. d/b/a/ Liberty Tax Service, et al., Plaintiffs,**

v.

**H & R BLOCK EASTERN TAX SERVICES, INC., et al., Defendants.**

No. CIV.A.2:00–CV–51.

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 23, 2002.

Walter Dekalb Kelley, Jr., Troutman Sanders LLP, Glen Michael Robertson,

Payne, Gates, Farthing & Radd, P.C., Norfolk, VA, Peter Vincent Chiusano, Willcox & Savage PC, Virginia Beach, VA, Frank Alwin Edgar, Jr., Kaufman & CAnoles PC, Newport News, VA, Carl Jay Khalil, Virginia, VA, for Plaintiffs.

Gregory N. Stillman, Benita Webster Ellen, Hunton & Williams, Norfolk, VA, Rodney F. Page, Daniel C. Schwartz, Elaine F. Foreman, Bryan Cave LLP, Washington, DC, N. Louise Ellingsworth, Mark W. Brennan, Nilesh S. Patel, Bryan Cave LLP, Kansas City, MO, for Defendants.

Robert L. O'Donnell, Richard Hooper Ottinger, Vandeventer Black LLP, Norfolk, VA, Carl Jay Khalil, Virginia Beach, VA, for Movant.

## MEMORANDUM OPINION AND ORDER

JACKSON, District Judge.

This matter is before the Court on Mandate from the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"). The above captioned matter was remanded for recalculation of the damages award and revision of the injunction.

## I. FACTUAL AND PROCEDURAL HISTORY

The factual history of the instant action is incorporated herein from the Court's Corrected Memorandum Opinion and Order, entered March 7, 2001. On April 20, 2001, the Court entered the Judgment in a Civil case. On May 23, 2001, the Court entered a decision denying Defendants' motion to amend the Court's Memorandum Opinion and Order, entered April 20, 2001, granting Plaintiffs' attorneys' fees. On June 22, 2001, Defendants filed a notice of appeal to the Fourth Circuit.

On February 4, 2002, the Fourth Circuit issued its mandate to the Court in accordance with its written opinion decided January 10, 2002, affirming in part, vacating in part and remanding the judgment of the Court. The Fourth Circuit directed the Court to reduce Defendants' profits by "appropriate elements of cost or deduction," as proved by Defendants. The Fourth Circuit cites to Defendants' expert testimony that stated the average per tax return revenues were $95.92, per return costs were $67.85, and the resulting net earnings per return were $28.07, as evidence of Defendants' costs. In addition, the Fourth Circuit found that the Court failed to calculate the net present value of the six-year future earnings. The Fourth Circuit indicated that, absent a finding that the properly calculated award was inadequate, the Court could not award in excess of net profits and the present value of future profits.

Finally, the Fourth Circuit found that the Court's injunction prohibiting Defendants' use of the "rapid refund mark" was over broad to the extent not already covered by the other provisions of the injunction and thus remanded for removal of that element of injunctive relief. Accordingly, the Court **ORDERS** that the provision of injunctive relief prohibiting the use of the "rapid refund mark" to the extent not otherwise prohibited by the injunction is hereby removed.

The Court's first Opinion and Order awarded damages based upon the Defendant's profits, necessarily finding that Defendants acted willfully and in bad faith. Specifically, the Court found that Defendants benefitted from their unfair practices by a relative 24% increase in returns, or 9,446 returns, in the areas subject to the NACRAL advertising campaign. The Court contemplated that Plaintiffs were not the only market competitors in the area, therefore, the entirety of Defendants' attributed profits could not be awarded to

Plaintiffs because the award would thus involve a punitive element. The Court found Plaintiffs' market share in the affected areas to be approximately 18%. Accordingly, the Court calculated 18% of the 9,446 returns, or 1700 returns, multiplied by an average fee per client of $83.22 to equal a presently measurable damage amount of $141,174. In addition, the Court calculated future attributable profits over a six-year period, employing an equitable proxy of 43% to represent the percentage of clients actually retained for future business, or 731 clients, to find an additional $365,003 of future profits denied to Plaintiffs by Defendants' unfair practices. The total award amount granted to Plaintiffs as measured by Defendants' profits was $506,477.

The Court also found that Plaintiffs were unable to demonstrate a quantifiable measurement of its actual damages and denied recovery of damages for reduced price sales, diversion of sales, and responsive advertising. Furthermore, the Court found that Plaintiffs did not argue or establish any harm to their business good will. In addition to Defendants' profits, the Court awarded Plaintiffs costs and reasonable attorney's fees.[1]

## II. ANALYSIS

The Court will first address the proper calculation of damages taking into consideration Defendants' proof of costs and then adjust the award of future profits to net present value.

### A. Recalculation of Damages

 The plaintiff is charged with proving the defendants' gross revenues, from which the defendants have the "burden … to establish any deductions for expenses or to demonstrate that the prof-

its introduced by the plaintiff were either 'attributable to factors other than the copyrighted work,' … or not attributable to infringing use under the Lanham Act." *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 940–41 (7th Cir.1989) ("The burden of proving an apportionment is on the defendant.") (applying Lanham Act to trademark infringement). Legal authority dictates that only variable costs, and not fixed costs, are to be deducted from gross revenues to calculate profits. *Id.* at 941 ("Fixed costs are not deducted from the profit calculation."); *see also Vanwyk Textile Sys. v. Zimmer Mach. Am., Inc.*, 994 F.Supp. 350, 382 (W.D.N.C.1997) ("The weight of authority holds that fixed overhead expenses need not be deducted from gross income to arrive at the net profit properly recoverable."); *cf. Black & Decker v. Pro–Tech Power Inc.*, 26 F.Supp.2d 834, 855–56 (E.D.Va.1998) (applying the entirety of defendant's costs to its gross revenues "because all of Pro–Tech's revenues are attributable to its yellow and black products, virtually all costs should be considered variable costs").

### 1. Defendants' Proof of Costs

Defendants' expert was Mr. H. Leon Hodges and his report is in the record as Defendants' Exhibit 256. In his report, Mr. Hodges attempted to quantify the expenses associated with the RAL returns, but was unable to assign per return revenue and cost figures to RAL returns versus all other returns. Tr. at 800. Both Defendants' and Plaintiff's experts, however, noted a RAL Expenses figure of $377,115. Mr. Hodges' report includes other general expenses, but does not (other than the RAL expenses line item) identify which of these, if any, are variable

---

**1.** The Court based its award of attorney's fees on its finding that Defendants' false advertis-

ing was malicious, deliberate and willful, thus rendering it the "exceptional case."

costs associated with the RAL Returns. Defendants' expert found, generally, the average revenue per return to be $95.92 and cost per return to be $67.84.

Defendants urge the Court to adopt Defendants' showing of costs per return as $67.84 and apply the amount to the Court's prior finding of Defendants' profits as proven by Plaintiffs. Defendants claim that Plaintiffs are estopped from asserting a profits figure other than $83.22 based on the principle of collateral estoppel. Defendants' proposed damages calculation, taking into account the net profits and net present value calculations based upon a 6.75% discount rate, would result in a total award of $71,682.

## 2. Plaintiff's Proof of Costs

The Court adopted Plaintiff's expert Mr. Stosch's testimony to find the average fee per client to be $83.22. However, plaintiffs argue that if the Court were to accept Defendants' calculation of costs, it should then also adopt their evidence of revenues, which figure is higher than the original amount found by the Court. Mr. Stosch's report is Plaintiffs' Exhibit 254. In his testimony, Mr. Stosch did not discuss a specific calculated amount for per return RAL costs.

Mr. Stosch refers to specific cost amounts associated with the RAL program. (See Exhibit 254, Tab 6). In addition, Mr. Stosch references the additional absorption of expenses and fee reductions as an element of cost incurred as a result of the RAL program. The total amount of Defendants' advertising costs, reduction in prices, and Direct Expenses—RAL, were $1,353,107. Divided by the number of returns, 49,120 (the same number used to compute the average fee per client), the average cost per return, according to these figures was $27.55. This calculation would be inappropriate, however, because it does not accurately compute the variable costs associated with the RAL returns specifically, but allocates it over all returns. In addition, these costs do not take into account any other variable costs associated with the preparation of additional returns in general. (See Exhibit 254, Tab 6). As indicated by Mr. Stosch's testimony (Tr. at 301) the total profits reflect those of the offices in the area, not necessarily the RAL program. Mr. Stosch stated that the profitability of the RAL customers, as separate from the total office profits, could not be broken down. Tr. at 308. Thus, to match a RAL-specific cost figure with a total office profits figure would be incongruous and speculative.

## 3. No Proof of Variable Cost

█ Of particular import to the Court is the lack of evidence offered for proof of a variable cost figure for the NACRAL campaign. The Court does not accept Defendants' proposed cost figure of $67.84 as sufficient proof of variable costs by which to reduce the damages award for Defendants' profits. The Defendants' cost figure incorporates both fixed and variable costs of preparing returns, and represents such for all returns. There is neither evidence nor computation of the variable costs attributed solely to the NACRAL returns. Furthermore, there is no possible way to derive the variable costs figure because there is no evidence in the record of the number of NACRAL returns and thus no denominator by which to allocate the variable costs. The Court finds that the RAL cost figures do not adequately represent the aggregate variable costs attributed to the RAL campaign and resulting return business, and do not offer an appropriate measure of deductible variable costs. Defendants bear the burden, which they found impossible to meet (as did the Plaintiffs). *See* Tr. at 308, 800. The

Court has considered Defendants' evidence of costs and finds that Defendants did not meet their burden of proof on several fronts. The Court cannot speculate what Defendants' variable costs might be and declines to reduce the damages award on something that is impossible to determine. Moreover, the Court will not permit Defendants the windfall opportunity to allocate their fixed costs to reduce an award for impermissibly obtained profits. Accordingly, the damages award for Defendants' current profits stands at $141,474.

## B. Net Present Value of Future Profits

■ The Court's award for future profits must be reduced to net present value.[2] Without the reduction to net present value, Plaintiffs receive a windfall because the award does not take into account the potential interest earning capacity of the damages award for profits that would not be realized until a future date. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). The Court's finding of the appropriate discount rate is central to the calculation of net present value. Defendants propose a discount rate at 6.75%, which they calculated by adding two points to the current treasury bill rate and noted, without further support, as "the common method for obtaining the current commercial interest rate." Def. Mem. at 3 n. 1. Plaintiffs, also without stated justification, use a 6% discount rate in their net present value calculations.

There is no clear formula for determining the appropriate discount rate, but the general approach employed by Courts is that "the discount rate should be based on the rate of interest that would be earned on the 'best and safest investments.' " *Id.* at 537, 103 S.Ct. 2541 (quoting *Chesapeake & Ohio R. Co. v. Kelly*, 241 U.S. 485, 491, 36 S.Ct. 630, 60 L.Ed. 1117 (1916)) ("in computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to the circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only") (figuring a discount rate for loss of future income in personal injury claim).

Generally, courts employ a modest discount rate to represent a "safe investment." *See Jones*, 462 U.S. at 548, 103 S.Ct. 2541 ("if forecasts of future price inflation are not used, it is necessary to choose an appropriate below-market discount rate") (noting that "we do not believe a trial court adopting a ['real interest rate'] approach in a suit under [Harborworker's Compensation Act] § 5(b) should be reversed if it adopts a rate between one and three percent and explains its choice"). The Court recognizes that the time period over which the present value is calculated impacts the discount rate, as long term interest rates yield higher returns to the investor than short term rates. Some courts have found it appropriate to consult the Federal Reserve interest rates for U.S. government securities Treasury constant maturities.[3] *See Liriano v. Hobart Corp.*, 960 F.Supp. 43, 46 (S.D.N.Y.1997) (discounting future damages from personal in-

---

**2.** Plaintiffs have filed a Motion to Schedule an Evidentiary Hearing for the purpose of determining the proper discount rate that should be applied in calculating the net present value of the award of future profits. The Court, in its discretion, has determined that a hearing is not necessary. Therefore, Plaintiffs' Motion to Schedule an Evidentiary Hearing is DENIED.

**3.** *See* http://www.federalreserve.gov.

jury award to present value "in accordance with generally accepted actuarial practices" by applying discount rates based on average federal Treasury bills currently on market, rather than based on broad spectrum of financial instruments over historical period); *Moeller v. Bertrang,* 801 F.Supp. 291, 296 (D.S.D.1992) (applying 90–day Treasury rate to determine present value of ERISA benefits); *Chaffin v. Southeastern Transport, Inc.,* 1996 WL 33107912, *3 (W.D.Va.1996) (unpublished) ("The court finds that the proper interest rate to use to discount ... projected income to its present value is the current rate on a one year Treasury bill of 2.234%").

The Court finds that a 3.5 % discount rate is appropriate because it reflects the modest return of a safe investment.[4] The fact that Plaintiffs are a business entity and not individuals does not alter the Court's finding of what the return from a "safe investment" would be, especially given the current economic circumstances. The Court will not speculate so much as to presume it may forecast whether or by how much any business entity or financially informed person may recover from an investment. Furthermore, a conservative discount rate compensates for more immeasurable variables, such as future inflation, future rate increases, and slow economic growth.

The Court finds, *supra,* that Defendants have not proven sufficiently their costs to reduce the Plaintiffs' present and future profits awards. Not only did the Defendants fail to inform the court of variable costs for NACRAL returns, but they also did not furnish the Court with average return variable cost figures. The Court adopts its original equitable proxy of 43%, which reflects the percentage of clients actually retained for future business, or 731 clients retained for an average of six years. Thus, Plaintiffs are awarded damages in the net present value of $438,404.11 ($141,474.00 present profits + present value of $365,002.92 future profits (731x583.22/per annum for 6 years), at a 3.5 % discount rate).[5]

## C. Availability of Enhancement Award to Compensate for Insufficient Damages.

Title 15, United States Code, § 1117(a) (Lanham Act § 35(a)) provides that "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum and the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty."

Plaintiffs invite the Court to award an enhancement to the computed damages and cite several bases in their memorandum to support an enhanced damages award. First, Plaintiff claims that Defendants will have the opportunity to cross-sell mortgages and other financial services to the customers in the future. Second, Defendants have a future stream of "license fees" from the RAL lender, which is a rebate received by Defendants for each

---

**4.** Dr. Neil B. Murphy, an expert economist who Defendants identified, recommended a 3.5% discount rate after review of *Daily Treasury Yield Curve Rates, at* http://www.treas.gov (Sept. 12, 2002) and U.S. Treasury Strips as reported in the Wall Street Journal of September 12, 2002.

**5.** Dr. Murphy calculated the present value damages using a Lotus 1–2–3 Spreadsheet and verified them with a Hewlett Packard 10B Business Calculator. Using a 3.5% discount rate, Dr. Murphy determined that the present value of $365,002.92 future profits is $296,930.11.

RAL they receive. The evidence shows that fee to currently be $9/per referral. Plaintiffs claim that this fee will be received in future years. Third, because the NACRAL prices were artificially lower the first year, it is inequitable to base future profits computations on the lower first-year profits; therefore, the Court should add $18.26 per return to the future net profits. Fourth, Plaintiffs claim that Defendants wrongfully diverted more than 1700 customers because it engaged in heavy advertising in the Tidewater area, but did not in the control cities of Richmond and Roanoke. Plaintiffs use this comparison to claim that the difference in percentage increases between the Tidewater areas and control cities would have been greater, thus favoring Plaintiffs, if Plaintiffs had the opportunity to advertise in the other cities and thereby similarly decrease Defendants' market share. Fifth, Plaintiffs point out that Defendants' actions harmed an emerging competitor and "inflicted maximum possible damage to Liberty and unfair benefit to [Defendants] for years to come." Pl. Mem. in Supp. of Damages at 5. Sixth, Plaintiffs argue that they lost the future benefit of referral business from the wrongfully diverted clients. Seventh, Plaintiffs claim that Liberty's ability to sell franchises was harmed, thus mitigating its ability to grow and become a stronger competitor. Finally, Plaintiffs claim that they lost future bank rebates from RAL's.

Defendants claim that an award enhancement is not warranted from the circumstances because the NACRAL program was not successful and resulted in a loss to Defendants. Furthermore, the Court awarded attorney's fees to Plaintiffs. Finally, Defendants point out that the Court "already exercised considerable discretion" when it found that 43% of customers return and awarded future profits for a period of six years. Defendants claim these findings were based on a footnote in an expert's report which was otherwise inadmissible evidence, thus "[t]here is no room left for a further departure from the economic realities of the NACRAL program and the admissible evidence to afford Plaintiffs a greater recovery." To order otherwise, Defendants argue, would result in punishment to them and a windfall to Plaintiffs.

The Court finds that given the award amount for Defendants' profits, at this juncture an enhancement is not warranted under the circumstances. Accordingly, the Court declines to enhance the current damages award, as recalculated.

## IV. CONCLUSION

For the reasons stated above, the Court **ORDERS** that the provision of injunctive relief prohibiting the use of the "rapid refund mark" to the extent not otherwise prohibited by the injunction is hereby removed and **ORDERS** a damage award in favor of the Plaintiffs in the net present value of $438,404.11. The Court has determined that a hearing is not necessary to determine the proper discount rate that should be applied in calculating the net present value of the award of future profits and therefore **DENIES** Plaintiffs' Motion to Schedule Evidentiary Hearing.

The Clerk is **DIRECTED** to send a copy of this Order to the parties.

IT IS SO **ORDERED**.