Luis LIRIANO, Plaintiff,

v.

HOBART CORPORATION, Defendant.

HOBART CORPORATION,
Third–Party Plaintiff,

v.

SUPER ASSOCIATED, Third–
Party Defendant.

No. 94 Civ. 5279 (SAS).

United States District Court,
S.D. New York.

Jan. 31, 1997.

Abby J. Resnick, Trolman, Glaser & Lichtman, P.C., New York City, for Plaintiff.

Saul Wilensky, Lester Schwab Katz & Dwyer, New York City, for Defendant Hobart.

William Kimball, New York City, for Third–Party Defendant Super Associated.

### OPINION AND ORDER

SCHEINDLIN, District Judge:

Following a jury award to plaintiff in the amount of $1,352,500, the parties were unable to agree on the discount rates to be applied pursuant to Article 50–B of the New York Civil Practice Law and Rules. *See* N.Y.C.P.L.R. § 5041 (McKinney 1992) ("Article 50–B"). For the reasons set forth below, I find that a discount rate of 5.82% should be applied to the lost wages award, 6.2% to the pain and suffering award, and 6.48% to the medical expenses award.

### Factual Background

This lawsuit stems from on-the-job injuries sustained by Luis Liriano ("Liriano") when his hand was caught in a commercial meat grinder in 1993. As a result of this accident, Liriano suffered an amputation of his dominant right hand and part of his forearm. At the time Liriano suffered these injuries, he was seventeen years old and employed by Super Associated ("Super"), a grocery store in the Bronx.

Liriano sued Hobart in 1994, alleging that Hobart was negligent for failing to warn users of the dangers of operating its machine without a guard. Hobart denied any culpability, insisting that no warning was required because removal of the guard was not fore-

seeable and because the dangers of operating the machine without a guard were obvious. Hobart also filed a third-party complaint against Super, contending that if Hobart was liable, then Super's removal of the guard constituted an intervening event which caused the accident.

A jury trial was held from January 29 to February 8, 1996. The jury found for Liriano and awarded him $650,000. Pursuant to this Court's Opinion and Order of July 23, 1996,[1] a retrial was held to determine the existence and extent of Liriano's comparative negligence. On September 9, 1996, the retrial jury found in a special verdict that plaintiff was 33.3% comparatively negligent, and awarded damages in the total amount of $1,352,500.[2]

A hearing was held on December 23, 1996 in which the parties provided expert testimony regarding the applicable discount rates. The parties also submitted post-hearing materials and arguments regarding the discount rate issue.

## Applicable Legal Standard

Article 50–B creates a "structured judgment" for personal injury awards whereby future damages above $250,000 are paid out in periodic installments rather than in one lump sum. The complex statutory guidelines of Article 50–B were thoroughly reviewed in *Alvarez–Icaza v. Cartier Inc.*, 920 F.Supp. 449 (S.D.N.Y.1996). Under Article 50–B, Liriano's judgment must be awarded in the following way:

(1) First, all attorney's fees and litigation expenses (including those related to future damages) are paid in a lump sum. N.Y.C.P.L.R. § 5041(c).

(2) Next, the entire amount of any past damages award, and the first $250,000 of any future damages award is also paid as a lump sum. *Id.* § 5041(b).

(3) The remaining future damages payments (i.e., total future damages award less the $250,000 lump sum payment and less attorney's fees and expenses) (the "Remainder") are reduced to the present value of an annuity contract that will provide for payment of the remaining amounts of future damages in periodic installments, but for no more than 10 years for a future pain and suffering award. *Id.* § 5041(e). The first year's annual payment is the Remainder divided by the number of years over which the payments will be made. Each succeeding year's payment is increased by 4% per year. *Id.*

(4) The present value of the annuity contract is to be determined "in accordance with generally accepted actuarial practices by applying the discount rate in effect at the time of the award" to the remaining future damages payments. *Id.*

## Discussion

Therein lies the rub. Article 50–B provides no guidance as to how a court should determine the discount rate "in effect at the time of the award", and the parties to this lawsuit have failed to agree on an applicable rate.[3] Thus, the Court must determine the proper discount rate. *See In re New York Asbestos Litig.*, 847 F.Supp. 1086, 1112 (S.D.N.Y.1994), *aff'd in part, vacated in part sub nom. Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003 (2d Cir.1995), *vacated on other grounds,* —— U.S. ——, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996).

Generally speaking, a "discount rate" is a way of estimating the time value of money,

**1.** *Liriano v. Hobart Corp. v. Super Associated,* No. 94 Civ. 5279, 1996 WL 304337 (S.D.N.Y.1996).

**2.** .The retrial jury verdict awarded the following: $300,000 for past pain and suffering, $ 400,000 for future pain and suffering, $ 0 for past medical expenses, $ 572,000 for future medical expenses, $ 33,000 for past lost wages, and $ 47,500 for future lost wages. Plaintiff was found to have been 33.3% comparatively negligent. Future pain and suffering was awarded for 54 years, future medical expenses for 54 years, and future lost wages for 4 years.

**3.** The lack of statutory direction with regard to the selection of applicable discount rates has been compounded by the absence of any authoritative judicial guidance on the matter. In its first and only encounter with Article 50–B, the New York State Court of Appeals did not explain how to determine the applicable discount rate because the issue had not been preserved for appeal. *See Rohring v. City of Niagara Falls,* 84 N.Y.2d 60, 614 N.Y.S.2d 714, 638 N.E.2d 62 (1994).

an important factor that is used in the process of determining the present value of a future cash flow.[4] The simplest formula for approximating the present value of a cash flow one year from now may be expressed:

$$PV = \frac{C}{1 + r}$$

Where PV equals the present value of the future income, C is the amount of the income expected one year from now, and r is the annual rate of interest on C amount of money invested now.

*See* R. Brealey & S. Myers, *Principles of Corporate Finance* 29–31 (4th ed.1991) (explaining how to determine the value of assets that produce future income); Michael C. Thomsett, *The Mathematics of Investing* 30–31 (1989) (same). *See generally* Michael J. Wolkoff and Eric A. Hanushek, *The Economics of Structured Judgments Under CPLR Article 50–B*, 43 Buff. L.Rev. 563 (1995) (discussing role of discount rates in Article 50–B structured judgments). As "r" *decreases,* the present value of the future income *increases.* It is for this reason that plaintiff seeks to apply lower discount rates than defendants.

The Department of the Treasury establishes short-term, mid-term and long-term discount rates on a monthly basis pursuant to 26 U.S.C. § 1274(d)(1)(B). These rates are based on the average market yield during any one-month period of outstanding marketable obligations of the United States with the applicable remaining periods to maturity. *See In re New York Asbestos Litig.,* 847 F.Supp. at 1113. Thus, the short-term rate is based on the average market yield on debt instruments with times to maturity not over three years, the mid-term rate is based on debt instruments with maturity dates over three years but less than nine years, and the long term rate is based on debt instruments with maturity dates over nine years. *See Alvarez–Icaza,* 920 F.Supp. at 453. Several courts have chosen to adopt these rates for purposes of calculating the present value of future damages under Article 50–B. *See, e.g., id.* at 454; *Sales v. Republic of Uganda,* 828 F.Supp. 1032, 1047 n. 18 (S.D.N.Y.1993); *Peterson v. Zuercher,* 152 Misc.2d 684, 584 N.Y.S.2d 968, 971–72 (Sup.Ct. Erie Co.1992),

*aff'd,* 198 A.D.2d 797, 605 N.Y.S.2d 689 (4th Dep't 1993).

Defendants urge the Court to follow *Alvarez–Icaza* and other cases that have adopted discount rates based on federal Treasury bills. At the December 23, 1996 hearing Dr. David Zaumeyer ("Zaumeyer") testified on behalf of Hobart that he "assumed that the appropriate discount rate would be a relatively conservative U.S. Government Treasury bill rate whose maturities would be as similar to those of the period over which the amounts are to be discounted." Transcript of December 23 Hearing ("Tr.") at 55–56. Thus, to find the applicable discount rate for the lost wages, Zaumeyer used the average yield on three-year Treasury bills; for pain and suffering, the average yield on 10–year Treasury bills; and for medical expenses, the average yield on 30–year Treasury bills.[5] From these figures, Zaumeyer determined that the applicable discount rates in this case should be 5.82% for lost wages, 6.2% for pain and suffering and 6.48% for medical expenses. *See* Tr. at 56.

By contrast, Dr. Les Seplaki (Seplaki) testified on behalf of plaintiff that the applicable discount rates should be 4.4% for lost wages, 4.4% for pain and suffering and 5.52% for medical expenses. These figures are based on Seplaki's historical analysis of the performance of "a broad spectrum of financial instruments", including a large number of federal debt instruments, over the past 45 years. Tr. at 22–23, 35. Seplaki explained that in addition to federal Treasury bills he considered the yields on money market instruments, corporate bonds, the federal funds market, and the rates that the New York Federal Reserve has charged to banks. However, he did not specify precisely which financial instruments serve as the basis of his calculations. *See* Tr. at 35–36.

Although it is too early to say that a consensus has developed as to the discount rates to be applied pursuant to Article 50–B, the cases cited above indicate that the fa-

---

4. This process is often referred to as "discounting" or "capitalizing" an income stream.

5. Zaumeyer did not look to historical data to determine these average yields, but rather averaged all the Treasury bills currently on the market. *See* Tr. at 23–24, 56–57.

vored method is to use the discount rates established by the Department of the Treasury (the "federal discount rates"). Absent evidence that using those rates would result in an unfair and inaccurate present value figure, the doctrine of *stare decisis* weighs in favor of following this approach. *See United States v. International Business Machines Corp.*, —— U.S. ——, ——, 116 S.Ct. 1793, 1801, 135 L.Ed.2d 124 (1996) (*stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process") (quotation omitted).

In deciding to adopt the discount rates suggested by defendants, I also compared the parties' methods of determining the applicable discount rates. To review, plaintiff's method of determining the applicable discount rates varies from defendants' in two fundamental ways. First, Seplaki analyzed a mix of different financial instruments, whereas Zaumeyer looked only to federal Treasury bills. *See* Tr. at 22, 55–56. Second, Seplaki took into account historical data over the course of the last 45 years, but Zaumeyer looked only to the yield of Treasury bills currently on the market. *See* Tr. at 23–24, 56–57.

Seplaki's choice of financial instruments is problematic because he did not identify exactly which instruments he used as a basis for his determination of applicable discount rates. There is no way to verify that his selection of financial instruments was fair and accurate.

In addition, I am skeptical that Seplaki's consideration of historical data is a superior technique for determining the applicable discount rates. Zaumeyer correctly observed that the yields on current Treasury bills represent the market's determination of a reasonable rate of return on investment based on all information available—including historical data. *See* Tr. at 66. When Zaumeyer used the average of the yields of currently available Federal debt instruments to determine applicable discount rates, he in effect used the market's analysis of historical data. There is no reason to think that the market's evaluation of historical data is less accurate

than Seplaki's. Indeed, the market's evaluation of the time value of money is probably more objective than that of an expert witness employed by a litigant.

By comparison, plaintiff's method of determining the applicable discount rates is supported by case law. It is also based on financial instruments that are identifiable and commonly recognized for their reliable reflection of the time value of money in low-risk investments. As noted earlier, plaintiff's method incorporates historical data via the market. I therefore conclude that plaintiff has suggested the appropriate method for determining the applicable discount rates.

### Conclusion

For the foregoing reasons, I apply discount rates of 5.82% for the lost wages award, 6.2% for the pain and suffering award, and 6.48% for the medical expenses award. The parties are directed to submit a joint proposed judgment incorporating these rates by February 14, 1997.