Howard H. UNDERWOOD, Jr. and Amy Underwood Plaintiffs,

v.

B–E HOLDINGS, INC. and BUCY-RUS–ERIE COMPANY Defendants/Third Party Plaintiffs,

v.

*IROQUOIS ROCK PRODUCTS, INC.* Third Party Defendant.

No. 96–CV–85S.

United States District Court, W.D. New York.

May 6, 2003.

Order Denying Reconsideration May 6, 2003.

Paul Williams Beltz, Paul William Beltz, P.C., Buffalo, NY, for Plaintiffs.

Dennis R. McCoy, Hiscock Barclay Saperston & Day, Buffalo, NY, for Defendants.

Dennis P. Glascott, Hurwitz & Fine, P.C., Buffalo, NY, for Third Party Defendant.

## DECISION & ORDER

SKRETNY, District Judge.

### *INTRODUCTION*

The motions currently before this Court involve the application of Article 50–B, New York's structured judgment statute. This task is always a challenging endeavor. As the current Chief Judge of New York has noted, applying Article 50–B is "every Judge's nightmare." In the instant case, the analysis is further complicated by a potential conflict between the mandates of Article 50–B and the Federal Rules of Civil Procedure with respect to the entry of a judgment, as well as a dispute between the parties regarding whether post-trial discovery is appropriate.

### *BACKGROUND*

The facts underlying this personal injury action are set forth in this Court's Decision and Order denying summary judgment (Docket No. 69). Briefly, on March 17, 1994, Plaintiff Howard Underwood, Jr. was working on a construction site when the boom of a crane fell on him. The crane was manufactured by Defendant Bucyrus Erie Company. (Defendant "Bucyrus"). Howard Underwood and his wife, Plaintiff Amy Underwood, commenced the instant action, alleging that Bucyrus was liable for their injuries because the boom's design was defective. Bucyrus impleaded Howard Underwood's employer, Third Party Defendant Iroquois Rock, Inc. (Defendant "Iroquois"), claiming that Iroquois was ultimately responsible for the accident because it failed to follow proper safety protocol and inadequately trained Howard Underwood.

On July 19, 2002, after a six-week trial held before this Court, a jury awarded Plaintiffs $7,190,712 (Docket No. 208). The following was awarded to Plaintiff Howard Underwood for past damages: medical expenses $120,175; loss of earnings $418,504; pain and suffering $1,000,000. For future damages, the jury award was as follows: medical expenses $1,654,736 over a period of thirty years; loss of earnings $962,578 over a period of fourteen years; pain and suffering $2,000,000 over a period of thirty years. Plaintiff Amy Underwood was awarded past damages of $199,240 and future damages of $835,497 over a period of thirty years.

On August 6, 2002, the Clerk of the Court entered a judgment equal to the amount of the jury's verdict. (Docket No. 221). On August 19, 2002, Defendant Iroquois filed a Motion to Alter or Amend the Judgment. Defendant Bucyrus followed suit on August 20, 2002, moving to Strike, Amend, or Stay Enforcement of the Judgment.

At the request of counsel, this Court delayed consideration of these motions for several months as the parties attempted to resolve the outstanding issues through mediation. After the parties indicated that they were unable to reach a settlement, this Court heard oral argument on January 8, 2003, and reserved decision at that time.

### DISCUSSION

### I. DEFENDANT BUCYRUS' MOTION TO STRIKE THE JUDGMENT

#### A. *Article 50–B*

■ During the mid–1980s, the New York State Legislature responded to a perceived liability insurance crisis by enacting two structured judgment provisions, Articles 50–A and 50–B. *See Alisandrelli v. Kenwood*, 724 F.Supp. 235, 238–39 (S.D.N.Y.1989). Article 50–B, which applies in the present case, provides a formula for structuring judgments in personal injury, wrongful death, and property damage actions in which the plaintiff is awarded more than $250,000 in future damages. *N.Y.C.P.L.R.* § 5041. The provisions of Article 50–B require that judgments be structured so that the plaintiff receives "periodic payments of future awards as opposed to the immediate lump-sum payment of a discounted award." *Bryant v. New York City Health and Hosp. Corp.*, 93 N.Y.2d 592, 695 N.Y.S.2d 39, 716 N.E.2d 1084, 1087 (1999).

In an opinion written by Chief Judge Judith S. Kaye, the Court of Appeals of New York noted that "[t]he structured judgment provisions have deservedly been labeled 'circuitous,' 'vexing,' as 'every Judge's nightmare,' and '[a]t best... ambiguous [which] can lead to inexplicable results.'" *Id.* at 1088 (citations omitted). The formula specified by Article 50–B has been summarized as follows:

> Awards for past damages and attorneys' fees, as well as the first $250,000 of awards for future damages, are immediately payable in a lump sum. Defendant is then required to purchase an annuity contract that will "provide for the payment of the annual payments of such remaining future damages." Further, the "annual payment for the first year shall be calculated by dividing the remaining amount of future damages by the number of years over which such payments shall be made and the payment due in each succeeding year shall be computed by adding four percent to the previous year's payment." The court, additionally, must "enter a judgment for the amount of the present value" of the annuity contract "that will provide for the payment of the remain-

ing amounts of future damages in periodic installments." The present value of the annuity contract "shall be determined in accordance with generally accepted actuarial practices by applying the discount rate in effect at the time of the award to the full amount of the remaining future damages, as calculated pursuant to this subdivision."

*Id.* (citations omitted).

### B. *Entry of Judgment*

Under the *Erie* doctrine, a federal court sitting in a diversity jurisdiction case must apply the substantive law of the state in which the court is located. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In the present action, the parties agree that New York's Article 50–B is substantive and must be applied to the jury's verdict. This is consistent with the case law in this Circuit. *See Alisandrelli,* 724 F.Supp. at 240–42 (holding that Article 50–B is substantive and must be applied by federal courts in diversity actions); *see also Gravatt v. City of New York,* 54 F.Supp.2d 233, 233–35 (S.D.N.Y.1999) (following *Alisandrelli* ). However, there is a serious dispute between the parties as to **when** a federal court should apply the 50–B formula. As far as this Court can determine, this question has not been explicitly addressed in this Circuit.

Defendants argue that the 50–B formula must be applied to the jury's verdict *before* a judgment may be entered. As such, they contend that the Clerk of the Court should not have entered a judgment in this case because the 50–B formula has not yet been applied. Although Plaintiffs admit that a New York state court would have applied the 50–B formula before entering a judgment in this case, they urge this Court to employ a different procedure. Plaintiffs suggest that a federal court sitting in diversity jurisdiction should first enter a

judgment in the amount of the jury's verdict, then apply the 50–B formula, and then finally amend the judgment to reflect the application of 50–B. In support of this argument, Plaintiffs contend that (1) the entry of a judgment is a procedural matter and is thus governed by the Federal Rules of Civil Procedure rather than state law and (2) applying the 50–B formula before entering a judgment frustrates the specific time limits for post-trial motions set forth in the Federal Rules.

■ This Court finds Plaintiffs' arguments unavailing. As discussed *supra,* it is undisputed that Article 50–B is substantive not procedural. The plain language of Article 50–B indicates that its statutory formula must be applied to a jury's verdict *before* a judgment is entered. In fact, Article 50–B begins with the phrase: "[i]n order to determine what judgment is to be entered on a verdict ...." *N.Y.C.P.L.R.* § 5041. The legislature clearly intended courts to delay entry of a judgment until the 50–B formula has been applied to the jury's verdict. In fact, as mentioned above, Plaintiffs admit that had this case been tried before a New York court, the judgment would not have been entered until it had been structured according to Article 50–B. Therefore, under the *Erie* doctrine, this Court finds that the state law requirement that Article 50–B be applied prior to the entry of a judgment should be adhered to in this case just as it would have been by a New York court.

■ Second, even assuming *arguendo* that the entry of a judgment is procedural and governed by the Federal Rules of Civil Procedure, the judgment in this case should not have been entered. Rule 58 of the Federal Rules of Civil Procedure states that "upon a special verdict ... the court shall promptly approve the form of the judgment, and the clerk shall there-

upon enter it." In the present case, this Court cannot approve the form of the judgment without reference to the formula set forth in Article 50–B. That is, under 50–B, (which everyone agrees must be applied here) the form of a judgment, in fact, even the *amount* of a judgment, cannot be approved or determined until the appropriate 50–B calculations have been made.[1] Therefore, even under Rule 58, this judgment should not have been entered until its form had been approved by this Court—that is, until after the 50–B formula had been applied.[2]

Finally, this Court acknowledges that the Federal Rules contain very specific time limits for post-trial motions. *See Fed R. Civ. P.* 50(b) (renewed motion for judgment as a matter of law must be filed no later than ten days after entry of judgment); *Fed. R. Civ. P.* 59(b) (motion for new trial must be filed no later than ten days after entry of judgment). However, these rules provide for time periods running from the *entry* of judgment, not the delivery of a verdict. Nothing in this Court's decision affects those time limits. Although Plaintiffs suggest that such a ruling will allow Defendants to delay filing of their post-trial motions "indefinitely," the time limits specified in the Federal Rules will begin to run once the proper judgment is entered (as in any other case). The fact that the judgment might be entered after a brief delay while the 50–B formula is applied certainly does not extend the time for filing post-trial motions "indefinitely." Further, the requirements of Rules 50 and 59 must be read in light of this Court's duty under Rule 58 to approve the form of the judgment. As discussed *supra,* the 50–B formula must be applied before the form of the judgment can be approved.

As such, this Court will direct the Clerk of the Court to strike the judgment entered on August 6, 2002, so that the proper adjustments can be made to the jury's verdict pursuant to New York's structured judgment statute.[3]

---

1. If Plaintiffs' suggested procedure was adopted, federal courts would be forced to routinely approve the entry of judgments that *no one* believed accurately reflected the amount due and owing to the prevailing party. That is, the court would be forced to enter a judgment with all parties knowing that it would need to be substantially amended at a later date to reflect the application of Article 50–B. This result is not only inconsistent with the plain language of Article 50–B, it contradicts the federal procedural requirement that the court review and approve the form of the judgment before it is entered. The present case bears this out—*no one* thinks that the judgment entered by the Clerk on August 6, 2002, is valid and enforceable. This Court finds that this type of judgment should not have been entered and must be stricken.

2. This Court is mindful that because the jury's verdict was rendered in July 2002, approval of the form of the judgment might not be considered "prompt" in this particular case. However, at multiple status conferences held on the record and in open court, this Court indicated that it was prepared to address and resolve the various outstanding motions attacking the judgment. Counsel for the parties asked this Court to delay resolution of these motions to facilitate ongoing settlement talks. As such, any lack of "promptness" cannot be attributed to a neglect of this Court's duty under Rule 58. Further, as indicated *infra,* the application of 50–B and entry of the proper judgment in this case will be done on an expedited basis.

3. Essentially, Iroquois' Motion to Alter or Amend the Judgment makes the same argument that Bucyrus makes in support of its Motion to Strike the Judgment. Iroquois contends that the judgment should not have been entered because the 50–B formula has not been applied. As this Court will grant Bucyrus' Motion to Strike the Judgment, Iroquois' motion will be denied as moot.

Further, along with its Motion to Strike the Judgment, Bucyrus filed a Motion for a New Trial or, in the alternative, a Renewed Motion for a Directed Verdict. As this Court will

## II. APPLICATION OF ARTICLE 50–B

Having resolved the question of whether a judgment should have been entered, it is necessary to address three additional issues with respect to how Article 50–B should be applied to the jury's verdict in this case. As discussed *supra,* Article 50–B contains a labyrinth of structured judgment procedures. In the instant case, the parties generally agree as to how this Court is to find its way through that maze. However, they differ as to (A) whether a collateral sources "set-off" is appropriate, (B) whether the present value of future damages should be calculated using "beginning of period" discounting or "midperiod" discounting, and (C) what discount rate should be applied to the jury's award of lost earnings. Each of these issues will be examined in turn.

### A. *Collateral Sources*

At common law, the "collateral sources rule" provided that a plaintiff's personal injury award was not to be reduced by the amount of any compensation received from a source other than the tortfeasor. *Bryant,* 695 N.Y.S.2d 39, 716 N.E.2d at 1091. However, during the mid–1980s, as part of the same tort reform movement that produced Article 50–B, the New York State Legislature began curtailing the common law collateral sources rule. *Id.* Under current New York law, as this Court previously held, a court may reduce an economic damages award to the extent that it finds that the plaintiff's economic loss "was or will, with reasonable certainty, be replaced or indemnified from any collateral source...." *Turnbull v. USAir,* 133 F.3d 184, 186 (2d Cir.1998) (quoting *N.Y.C.P.L.R.* § 4545(c)).

■ The first step in the application of the 50–B formula is to determine whether a set-off for collateral sources is appropriate. The statute directs the court to "apply to the findings of past and future damages any applicable rules of law, including set-offs ...." *N.Y.C.P.L.R.* § 5041(a). With respect to this set-off, "[t]he burden is on the defendant to prove that a plaintiff's award should be reduced by payments received from collateral sources." *Damiano v. Exide Corp.,* 970 F.Supp. 222, 229 (S.D.N.Y.1997) (citing *Adamy v. Ziriakus,* 231 A.D.2d 80, 659 N.Y.S.2d 623, 627 (4th Dep't 1997)). The

---

grant the Motion to Strike the Judgment, there is currently no judgment in this case. As such, this Court will deny Bucyrus' Motion for a New Trial and Renewed Motion for a Directed Verdict without prejudice and with leave to re-file after the entry of a judgment.

In addition, on November 12, 2002, Iroquois filed a Motion for Relief from Judgment due to Clerical Mistake pursuant to Rule 60(a) of the Federal Rules of Civil Procedure. Iroquois argued that the form of the judgment was defective because (1) it failed to enumerate separately the liability of Defendants to Plaintiffs and the liability of the third-party defendant (Iroquois) to the third-party plaintiffs (Bucyrus) and (2) it failed to clearly establish the amount that each party may recover from the other. The crux of Iroquois' motion is that the judgment should reflect that the full amount of the judgment is owed by Bucyrus. Neither Plaintiffs nor Bucyrus

dispute this proposition. As discussed *supra,* the judgment entered on August 6, 2002, will be stricken from the record. As such, Iroquois' motion (which was directed toward that judgment) is technically moot and will be denied. However, this Court notes the agreement of the parties and directs that any proposed judgment be formatted in accordance with that agreement.

Finally, on November 26, 2002, Plaintiffs filed a Cross–Motion for an Order requiring Defendants to Post a Security pursuant to Rule 62(b) of the Federal Rules of Civil Procedure. However, Rule 62(b) is only applicable when a litigant requests a stay of enforcement of a judgment. Since, due to this Court's decision on the instant motion, there is currently no judgment in this case, Plaintiffs' motion will be dismissed without prejudice and with leave to re-file, if appropriate, after the entry of a judgment.

defendant is allowed to obtain information relative to collateral sources payments during pre-trial discovery. *Damiano*, 970 F.Supp. at 229. The defendant then requests a post-trial hearing to resolve how much, if it all, the jury's verdict should be reduced to account for collateral sources. *Id.* However, "a defendant who fails to request a collateral source hearing or fails to present proof of collateral source payments waives his right to claim a set-off . . . ." *Id.*

In the present case, the jury awarded economic damages to Plaintiff Howard Underwood. Defendants contend that Howard Underwood has received (and will continue to receive) income from collateral sources and, as such, they have requested a collateral sources set-off. However, Defendants have not presented proof regarding collateral source payments. Instead, they have asked this Court to permit them to engage in post-trial discovery in an effort to obtain the requisite information. Plaintiffs argue that Defendants have waived their right to have the judgment reduced by collateral sources. They claim that Defendants have failed to set forth factual allegations relative to collateral sources and, as such, are not eligible to receive the collateral sources set-off provided for under New York law. Defendants concede that post-trial discovery is generally not permitted. However, they argue that Plaintiffs failed to adequately respond to discovery demands relative to Howard Underwood's income from union, disability, retirement, and social security benefits. As such, Defendants contend that post-trial discovery on this issue is appropriate.

Defendants rely principally upon *Hoffman v. S.J. Hawk, Inc.*, 177 Misc.2d 305, 676 N.Y.S.2d 448 (1998). In that case, the defendants requested post-trial discovery with respect to various collateral sources.

The court held that "absent prejudice to defendants post verdict discovery is unavailable and any application for same should be denied." *Id.* at 451. As such, the court denied the defendants' request for post-trial discovery as to the plaintiff's earnings, no-fault, and workers' compensation benefits. *Id.* However, the court found that defendants were entitled to limited post-trial discovery on the issue of Social Security disability benefits because the "plaintiff was found totally disabled and entitled to disability benefits after the filing of the note of issue but prior to the trial of this action." *Id.* In the present case, Defendants argue that as in *Hoffman*, they will be prejudiced unless this Court permits post-trial discovery.

This Court finds Defendants' arguments unavailing. First, the provision of New York law providing for a collateral sources set-off is "a statute enacted in derogation of the common law and, as such, is to be strictly construed." *Oden v. Chemung County Indus. Development Agency*, 87 N.Y.2d 81, 86, 637 N.Y.S.2d 670, 661 N.E.2d 142 (1995). Second, Defendants are not automatically entitled to a collateral sources set-off. In fact, they bear the burden of establishing that such a set-off is appropriate in this particular case. *See Damiano*, 970 F.Supp. at 229. Third, when a defendant fails to produce evidence of collateral source payments for the court's consideration, the right to a collateral sources set-off can be waived. *Id.* (finding that "a defendant who fails to . . . present proof of collateral source payments waives his right to claim a set-off"); *see also Hill v. Muchow*, 178 A.D.2d 954, 579 N.Y.S.2d 254, 255 (4th Dep't 1991) (holding that "[i]nasmuch as defendants did not submit evidence of collateral source payments for the court's consideration, the court did not err in failing to reduce the award pursuant to C.P.L.R.

§ 4545"). Fourth, as Defendants acknowledge, post-trial discovery is generally not permitted. *See Hoffmann,* 676 N.Y.S.2d at 451; *Bongiovanni v. Staten Island Med. Group,* 188 Misc.2d 362, 728 N.Y.S.2d 345, 349 (2001) (holding that "[d]iscovery of collateral sources of payment is not to be done after a jury verdict ...").

Finally, Defendants misread *Hoffmann.* They urge this Court to read that case as holding that post-trial discovery is appropriate whenever the defendant would suffer prejudice. Read literally, the case could be construed as supporting that position. *See Hoffmann,* 676 N.Y.S.2d at 451 ("absent prejudice to defendants, post verdict discovery is unavailable and any application for same should be denied"). However, the court in *Hoffmann* clearly felt that applications for post-trial discovery on collateral sources should generally be *denied. Id.* This contradicts Defendants' reading because the denial of post-trial collateral sources discovery will *always* prejudice the party requesting discovery to some extent (because it may be unable to prove its entitlement to a set-off). This Court finds that *Hoffmann* stands for the limited proposition that a party may be entitled to post-trial discovery when it has been *unfairly* prejudiced by a new stream of collateral source income revealed only after the close of discovery. *See id.* (granting post-trial discovery as to Social Security disability benefits because "plaintiff was found .... entitled to disability benefits *after* the filing of the note of issue but prior to the trial of [the] action") (emphasis added). The *Hoffmann* court did not hold that a defendant is entitled to post-trial discovery whenever it has failed to obtain the necessary information during the normal discovery period. *See id.* (denying request for post-trial discovery as to certain collateral sources because the plaintiff had "submitted to an oral deposi-

tion and provided authorizations" during discovery).

▮ The instant action does not present a case of unfair surprise or prejudice with respect to collateral sources. Defendants were permitted to conduct pre-trial discovery on this issue. However, they failed to obtain the information necessary to establish that a collateral sources set-off is appropriate. Rather, Defendants contend that they are entitled to additional, post-trial discovery because Plaintiffs failed to adequately respond to certain discovery demands. Specifically, Defendants argue that Plaintiffs failed to adequately answer and update various interrogatories seeking information relative to collateral sources. However, as Defendant Bucyrus itself acknowledged with respect to another motion in this case "this matter has undergone over five years of discovery— ample time for parties to request and receive discovery ... [a] demand for additional discovery which [a party was] given ample time to request in the five years of discovery is improper and untimely." *Defendants' Opposition to Plaintiffs' Motion to Compel,* at ¶¶ 10, 13. In like manner, Defendants had ample time to request additional discovery with respect to collateral sources during the five year discovery period, which ended on December 29, 2000. Their request for post-trial discovery, made some nineteen months after the close of discovery, is improper and untimely.

Even assuming *arguendo* that Plaintiffs' responses to Defendants' interrogatories were not as complete as Defendants would have liked, any complaint that Defendants had with respect to this issue should have been raised during discovery or within a reasonable time thereafter. Although this Court recognizes the significant policy concerns implicated by the rule permitting a

collateral sources set-off, there would be a serious injustice if this Court were to permit further delay in Plaintiffs' recovery to allow for discovery with respect to matters that could have been, and should have been, addressed long ago.

As to Social Security disability benefits in particular, Defendants contend that they were unaware that Howard Underwood was receiving such benefits. However, the record indicates that Defendant Iroquois' counsel requested and received authorization from Howard Underwood allowing Iroquois to access his Social Security records. This took place in November 1998, some seven months after the Social Security Administration decided to award Howard Underwood benefits (and more than two years before the close of discovery). In addition, the record demonstrates that Plaintiffs provided numerous medical authorizations and reports to Defendants that included references to Howard Underwood and Social Security disability benefits. This is distinctly unlike the situation presented in *Hoffmann.* In the present case, Howard Underwood was awarded benefits more than two *years* before the close of discovery (not after discovery, as in *Hoffmann*). In addition, Defendants cannot rightly claim that they were surprised to learn that Howard Underwood was receiving benefits. The evidence demonstrates that based upon the medical records and authorizations provided by Plaintiffs, Defendants either knew, or reasonably should have known, of Howard Underwood's Social Security status.

As such, this Court finds that post-trial discovery would be inappropriate. Further, this Court finds that Defendants have not presented proof sufficient to establish that a collateral sources set-off is appropriate in this particular case.

## B. *Discounting Method*

After subtracting for collateral sources (if any) and comparative negligence, the remaining verdict amount is structured according to the procedures specified in C.P.L.R. §§ 5041(b)—(e). Past damages and the first $250,000 are immediately paid in a lump sum. *N.Y.C.P.L.R.* § 5041(b). The $250,000 lump sum is subtracted proportionally from each category of future damages. *Id.* This yields the net value of future damages that will be used to provide future annuity payments to the plaintiff. After making the adjustments provided under §§ 5041(b),(c), and (d), the court "shall enter a judgment for the amount of the present value of an annuity contract that will provide for the payment of the remaining amounts of future damages in periodic installments." *N.Y.C.P.L.R.* § 5041(e). The statute further directs that "[t]he present value of such contract shall be determined in accordance with generally accepted actuarial practices by applying the discount rate in effect at the time of the award to the full amount of the remaining future damages . . . ." *Id.*

In the instant case, the parties urge competing methods for discounting the future damages to present value. Defendants point out that Article 50–B provides for payments to be made "in equal monthly installments and in advance." As such, they contend that a technique called "mid-period" discounting is appropriate. Defendants' economist, Matthew McCabe, states that the "mid-period discounting technique assumes that all payments are due as of the middle of the year, thus accounting for the statutory language requiring payments in equal monthly installments throughout each year." *McCabe Affidavit,* at ¶ 14. Plaintiffs urge a method known as "beginning of period" or "annuity due" discounting. Plaintiffs' economist, Dr. Ronald Reiber, asserts that the "annuity due"

method is the only method that accounts for the fact that all payments are due and owing at the beginning of the year. *Reiber Affidavit,* at p. 3–4.

This Court finds *Young v. Tops Markets, Inc.,* 283 A.D.2d 923, 725 N.Y.S.2d 489 (4th Dep't 2001), controlling on this issue. First, it is well-settled that "[f]uture damages are a 'debt owed entirely as of the date of the liability verdict,' and '[t]he structured judgment schemes of articles 50–A and 50–B do not delay liability.' " *Id.* at 492 (quoting *Rohring v. City of Niagara Falls,* 84 N.Y.2d 60, 614 N.Y.S.2d 714, 638 N.E.2d 62, 65–66 (1994)). Second, *Young* affirmed a lower court's decision to "calculate[ ] the monthly payments during the first year of the annuity contract using the 'annuity due' formula . . . ." *Young,* 725 N.Y.S.2d at 492. The court reasoned that this method was appropriate because it "is based on the premise that the first-year payment is due and owing as of the beginning of the year." *Id.*

Defendants point out that the *Young* court was not presented with the question of whether "mid-period" discounting was appropriate. They assert that *Young* merely stands for the proposition that the "annuity due" method ("beginning of the year" discounting) is preferable to another discounting method called "traditional annuity" or "end of the year" discounting. Defendants read *Young* too narrowly. The court in *Young* relied upon the Court of Appeals' decision in *Rohring v. City of Niagara Falls.* In *Rohring,* the Court of Appeals held that while Article 50–B "altered how liability was to be settled; it did not delay liability or even spread it out over a period of time." 614

N.Y.S.2d 714, 638 N.E.2d at 65. In support of this holding, the *Rohring* court noted that various provisions of the C.P.L.R. allow a court "in certain hardship circumstances, to abandon the periodic payment schedule and order a lump-sum judgment." *Id.* In the present case, Defendants' argument in favor of "mid-period" discounting relies heavily upon the statutory language providing for monthly payments. *See McCabe Affidavit,* at ¶¶ 11–18. This Court finds that in light of *Young* and *Rohring,* this emphasis is misplaced. The salient point of both decisions is that notwithstanding the provision in Article 50–B providing for monthly payments, the critical fact is that the defendant owes the full amount of future damages as of the date of the verdict. As such, the "annuity due" technique is the proper discounting method since it "is based on the premise that the first-year payment is due and owing as of the beginning of the year." *Young,* 725 N.Y.S.2d at 492. Therefore, this Court will adopt the "annuity due" methodology urged by Plaintiffs and endorsed by the court in *Young.*

## C. *Discount Rates*

The final issue with respect to the application of Article 50–B is what discount rate should be applied to the jury's award of future lost earnings. As noted *supra,* the jury awarded Howard Underwood $962,578 over a period of fourteen years for his future lost earnings.[4] Article 50–B mandates that this award be discounted to present value using "the discount rate in effect at the time of the award." *N.Y.C.P.L.R.* § 5041(e). However, the statute "provides no guidance as to how a court should determine the discount

---

**4.** The jury also awarded Howard Underwood damages for future pain and suffering, as well as future medical expenses. The parties appear to be in agreement as to what rates should be applied to the these damages.

rate 'in effect at the time of the award.'" *Liriano v. Hobart Corp.*, 960 F.Supp. 43, 44 (S.D.N.Y.1997).

In the present case, the parties agree that this Court should use the discount rates established by the United States Department of the Treasury. This is consistent with the case law in this Circuit. *See id.* at 45–46 ("[a]lthough it is too early to say that a consensus has developed as to the discount rates to be applied pursuant to Article 50–B, the cases . . . indicate that the favored method is to use the discount rates established by the Department of the Treasury").

The relevant date in the instant case is July 19, 2002 (the date the jury rendered its verdict). Plaintiffs' expert, Dr. Reiber, avers (and Defendants do not dispute) that the U.S. Treasury Securities Rates (Constant Maturities) for the date were: 4.68% for a 10 year security and 5.52% for a 20 year security. *Reiber Affidavit*, at ¶ 23. Dr. Reiber further suggests that the 10 year rate should be applied to the lost earnings award. He contends that there is no justification for applying the 20 year rate, which is six years longer that the time period determined by the jury. Defendants' expert, Matthew McCabe, provided sample calculations to this Court that applied the 20 year rate of 5.52% to the lost earnings award.[5] *See McCabe Sample Calculations* (attached as Exhibit B to McCabe Affidavit). It is not clear why Defendants advocate the 20 year rate as opposed to the 10 year rate.

At oral argument, counsel for Defendant Bucyrus suggested that a "blended rate" might be appropriate. This blending would take into account the fact that the jury award of 14 years falls roughly between the 10 and 20 year Treasury Rate periods Plaintiffs' counsel stated that they had no objection to the use of a blended rate. This is consistent with New York case law noting that "courts have been permitted to average values from different indices to derive an appropriate [discount] rate." *Bermeo v. Atakent*, 241 A.D.2d 235, 671 N.Y.S.2d 727, 734 (1st Dep't 1998). This Court finds that a blended rate is appropriate in this case and should be applied to the jury's award of lost earnings. As such, Plaintiffs are to prepare a proposed judgment using a blended rate with respect to the lost earnings award.[6]

### CONCLUSION

For the foregoing reasons, this Court finds that the judgment entered on August 6, 2002, should be stricken. Further, that Defendants are not entitled to post-trial discovery with respect to collateral sources, that the "annuity due" formula advocated by Plaintiffs is appropriate, and that a blended discount rate should be applied to the jury's award of future lost earnings.

### ORDERS

IT HEREBY IS ORDERED that Defendant Bucyrus' Motion to Strike the Judgment (Docket No. 225–2) is GRANTED.

FURTHER, that the Clerk of the Court is directed to STRIKE the Judgment entered on August 6, 2002 (Docket No. 221).

---

**5.** As discussed *supra* in note 4, the parties apparently agree that the 10 year rate should be applied to the future pain and suffering award and the 20 year rate should be applied to the future medical expenses award. This Court concurs in this conclusion.

**6.** After the Plaintiffs submit their proposed judgment, Defendants will be provided with an opportunity to file objections, if any, to Plaintiffs' determination of the appropriate blended rate.

FURTHER, that Defendant Iroquois' Motion to Alter or Amend the Judgment (Docket No. 224) is DENIED as moot.

FURTHER, that Defendant Bucyrus' Motion for a New Trial and Renewed Motion for a Directed Verdict (Docket No. 225-1) are DENIED *without prejudice* and with leave to re-file after the entry of a judgment.

FURTHER, that Defendant Bucyrus' Motion to Stay Enforcement of the Judgment (Docket No. 225-3) is DENIED as moot.

FURTHER, that Defendant Iroquois' Motion for Relief from Judgment due to Clerical Error (Docket No. 242) is DENIED as moot.

FURTHER, that Plaintiffs' Motion for a Security (Docket No. 245) is DENIED *without prejudice* and with leave to re-file after the entry of a judgment.

FURTHER, that Plaintiffs shall file with the Clerk of the Court and serve a proposed judgment consistent with this Decision and Order no later than close of business on Monday, March 17, 2003.

FURTHER, that counsel for the parties shall appear before this Court on Tuesday, April 8, 2003, at 9:00 a.m., in Part IV, United States Courthouse, 68 Court Street, Buffalo, New York for a status conference.

SO ORDERED.

## DECISION & ORDER

### INTRODUCTION

Currently before this Court are two motions for reconsideration of a Decision and Order issued on February 28, 2003. In addition, this Court must resolve the issue of whether federal or state law governs the calculation of post-judgment interest.

### BACKGROUND

The facts of this case are summarized in the February 28, 2003 Decision and Order. Familiarity with that decision is presumed. On July 19, 2002, after a six-week trial, a jury awarded Plaintiffs Howard and Amy Underwood $7,190,712 for damages suffered as a result of a construction site accident that occurred in March 1994. Counsel for the parties filed various post-trial motions. Defendants B–E Holdings, Inc. and Bucyrus–Erie Company (collectively, Defendant "Bucyrus"), along with Third–Party Defendant Iroquois Rock Products, Inc. (Defendant "Iroquois")[1] requested, *inter alia,* post-trial discovery and a hearing regarding Plaintiff Howard Underwood's income from various collateral sources.

On February 28, 2003, this Court issued a Decision and Order. With respect to the issue of post-trial discovery, this Court determined that Defendants were not entitled to such discovery. Further, this Court concluded that Defendants had not met their burden of establishing that the jury's award should be reduced to account for income from collateral sources.

On March 10, 2003, Bucyrus filed a Motion for Reconsideration of this Court's Decision and Order insofar as it pertained to the issue of collateral sources.[2] Iroquois filed a Motion for Reconsideration with respect to the same issue on March 14, 2003.[3]

---

1. Bucyrus and Iroquois will be referred to collectively herein as "Defendants."

2. Bucyrus filed a memorandum of law and reply affirmation in support of this motion.

3. Iroquois filed a memorandum of law and reply affidavit in support of this motion. Plaintiffs filed an attorney affidavit in response to both motions. In addition, this Court directed Plaintiffs to file a sur-reply addressing a specific issue raised in Defen-

On April 7, 2003, this Court received a letter from Plaintiffs' counsel indicating that the parties were unable to reach an agreement as to the appropriate post-judgment interest rate. This matter was discussed at a status conference held before this Court on April 8, 2003, and the parties were thereafter given the opportunity to file memoranda of law detailing their respective positions.[4]

## DISCUSSION

### A. Defendants' Motions for Reconsideration

▬ Motions for reconsideration are not recognized *in haec verba* under the Federal Rules of Civil Procedure. However, it is well-established that a district judge may modify pre-trial rulings and interlocutory orders at any time prior to final judgment. *See In re United States,* 733 F.2d 10, 13 (2d Cir.1984). Reconsideration of a prior decision is generally justified in any one of the following three circumstances: (1) an intervening change in controlling law; (2) new evidence; or (3) the need to correct a clear error of law or to prevent manifest injustice. *See Virgin Atl. Airways, Ltd. v. National Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992); *see also Amerisure Ins. Co. v. Laserage Tech. Corp.,* No. 96–CV–6313, 1998 WL 310750, at *1 (W.D.N.Y. Feb. 12, 1998) (citing *United States v. Adegbite,* 877 F.2d 174, 178 (2d Cir.1989)).

▬ The decision as to whether to grant such a motion lies within the discretion of the district court. *See McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983). The standard is "strict", and "reconsideration will generally be denied unless the moving party can point to ... matters ... that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). Parties may not use a motion for reconsideration as a means to reargue matters already disposed of by prior rulings or to put forward additional arguments that could have been raised prior to the decision. *See Duane v. Spaulding and Rogers Mfg. Inc.,* No. 92–CV–305, 1994 WL 494651, at *1 (N.D.N.Y. Aug. 10, 1994). After all, a "motion for reconsideration is not a device intended to give an unhappy litigant one additional chance to sway the judge." *Nossek v. Bd. of Ed. of Duanesburg Cent. Sch. Dist.,* No. 94–CV–219, 1994 WL 688298, at *1 (N.D.N.Y. Nov. 10, 1994).

In the present case, Defendants offer two principal arguments in support of their respective motions. Both arguments deal with the issue of collateral sources.[5] First, Defendants contend that this Court did not give sufficient weight to Plaintiffs' failure to formally update an interrogatory response regarding Howard Underwood's social security disability benefits. Second, they argue that this Court should have conducted a hearing on the issue of collat-

---

dants' motion papers. Although Plaintiffs filed their sur-reply one day late, it was considered by this Court.

4. Plaintiffs filed an attorney affidavit and reply affidavit in support of their position. Bucyrus filed a memorandum of law in support of its position. Iroquois did not file a submission with respect to this issue.

5. It should be noted that in its February 28, 2003 Decision and Order, this Court found that Defendants were not entitled to post-trial discovery regarding various collateral sources, including union, disability, retirement, and social security disability benefits. Defendants' motions for reconsideration seek reconsideration of this Court's ruling only with respect to social security disability benefits.

eral sources. These arguments will be addressed in turn.

### 1. *Plaintiffs' Interrogatory Response*

 During discovery in this case, Defendants submitted an interrogatory requesting information as to whether Plaintiff Howard Underwood was receiving social security disability benefits. Plaintiffs' response to that interrogatory stated that Howard Underwood was not receiving such benefits. Apparently, at some point after giving that answer, Howard Underwood began receiving social security disability benefits. Thereafter, Plaintiffs provided Iroquois with authorizations permitting Iroquois to obtain records from the Social Security Administration. In addition, Plaintiffs supplied both Defendants with numerous documents that included references to Howard Underwood and social security disability benefits. However, it appears that Plaintiffs never formally updated their initial interrogatory response.

Defendants argue that they are entitled to post-trial discovery due to Plaintiffs' failure to formally update their interrogatory response. This argument has already been advanced, considered, and rejected. In its February 28, 2003 Decision and Order, this Court found that based upon the information provided to Defendants during discovery, they "either knew, or reasonably should have known, of Howard Underwood's Social Security status." (*Decision & Order*, p. 13.) Moreover, this Court concluded that any objections "that Defendants had with respect to Plaintiffs' interrogatory responses should have been raised during discovery or within a reason-

able time thereafter." (*Decision & Order*, p. 12.)

A district court possesses wide discretion in determining what punishment, if any, is appropriate for failure to conform to the rules of discovery. *See Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir.1988). This Court finds no cause to revisit its determination that, on the facts of this particular case, Defendants were not entitled to post-trial discovery as a remedy for Plaintiffs' apparent failure to formally update their interrogatory response.[6]

### 2. *Collateral Sources Hearing*

Defendants contend that they are entitled to a hearing, where they would present expert testimony on the benefits that Howard Underwood is entitled to receive in the future under the Social Security Act. They assert that this Court erred by electing not to conduct such a hearing and urge reconsideration of that decision.

This Court finds no error in its February 28, 2003 Decision and Order. It was this Court's understanding that Defendants had no evidence with respect to Howard Underwood's collateral source income. Indeed, Defendants' request for post-trial discovery was based upon the fact that they lacked such evidence. As such, after this Court determined that Defendants were not entitled to post-trial discovery, there seemed to be no need for a collateral sources hearing (because Defendants, the party with the burden of proof, appeared to have no evidence to present at a hearing). Although Defendants did request a collateral sources hearing shortly after the jury delivered its verdict, Defen-

---

**6.** This Court also notes that in support of their motions for reconsideration, Defendants appear to suggest that Plaintiffs' failure to formally update their interrogatory response may have been willful. However, a review of the authorizations provided to Defendant Iroquois and the documents provided to both Defendants belies any assertion that Plaintiffs attempted to conceal Howard Underwood's receipt of social security disability benefits.

dants' current argument—that they are entitled to a collateral sources hearing despite their lack of direct evidence—was not squarely presented to this Court until now. However, due to the important policy considerations implicated by this issue, this Court will address the merits of Defendants' argument.

Section 4545 of the New York Civil Practice Law and Rules provides, in pertinent part, that "evidence shall be admissible for consideration by the court to establish that any ... future cost or expense ... will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source ...." N.Y.C.P.L.R. § 4545(c). Subject to certain limitations, the court is then required to reduce the jury's award by the amount of collateral source income established by the evidence. N.Y.C.P.L.R. § 4545(c). In this context, the term "reasonable certainty" has been interpreted as requiring "clear and convincing proof." *Caruso v. Russell P. LeFrois Builders, Inc.*, 217 A.D.2d 256, 635 N.Y.S.2d 367, 369 (4th Dep't 1995). With respect to future social security disability payments, it is well-settled that such benefits are collateral sources within the meaning of § 4545. *See Turnbull v. USAir*, 133 F.3d 184, 186–88 (2d Cir.1998).

▆▆ In the present case, in order to qualify for a collateral sources set-off, Defendants "must show that it is highly probable that plaintiff will continue to be eligible for Social Security benefits." *Caruso*, 635 N.Y.S.2d at 369. In this regard, they seek to introduce expert testimony establishing that certain of Howard Underwood's future costs or expenses will, with reasonable certainty, be replaced or indemnified by social security disability benefits. Plaintiffs argue that an expert opinion is "by its very nature speculative" and can never serve as clear and convincing proof with respect to collateral sources.

This Court finds Plaintiffs' argument unpersuasive for the following reasons. First, § 4545 speaks broadly of "evidence" that "shall be admissible for consideration by the court" regarding collateral sources. Nothing in the language of the statute suggests that the legislature intended to categorically exclude expert testimony from the definition of "evidence." In addition, Plaintiffs failed to cite, and this Court could not find, any case law standing for that proposition. Second, the fact that an expert opinion may be, in some sense, speculative does not render it *per se* inadmissible. Indeed, the fact that the statute speaks of "reasonable" certainty indicates that some degree of speculation is inevitable when dealing with *future* collateral source income. Further, the opinion of Defendants' expert will no doubt be based upon objective facts adduced at trial, such as Howard Underwood's age and medical condition. In addition, the expert will likely rely upon objective data from the Social Security Administration regarding eligibility requirements and the amount of benefits.

As such, this Court finds that Defendants are entitled to a hearing to submit expert testimony on future benefits that Howard Underwood may be entitled to receive under the Social Security Act.[7] If this testimony demonstrates that some of Howard Underwood's costs or expenses will, with reasonable certainty, be replaced

---

7. At the present time, this Court takes no position as to whether a formal "hearing" with live testimony is necessary. This matter will be discussed at the May 6, 2003 status conference. It should also be noted that the hearing will be limited to the evidence proffered by Defendants in the instant motion: expert testimony on the benefits that Howard Underwood is entitled to receive under the Social Security Act, *in the future*.

by those benefits, the jury's award will be reduced accordingly pursuant to C.P.L.R. § 4545.

### B. *Post–Judgment Interest*

Title 28 U.S.C. § 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Under this provision, interest is calculated from the date of the entry of a judgment at a rate equal to the United States Treasury Bill rate. 28 U.S.C. § 1961(a). In contrast, under New York law, interest on a money judgment is awarded at a rate of nine percent *per annum.* N.Y.C.P.L.R. §§ 5003, 5004. In the instant case, which is in federal court based upon diversity jurisdiction, Defendants argue that the federal interest rate established by § 1961 applies. Plaintiffs assert that the *Erie* doctrine compels this Court to set aside that provision and apply the nine percent rate established by New York law.[8]

This question has not been squarely addressed by the Second Circuit. In *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 55 (2d Cir.1998), the court applied the federal interest rate. However, that case involved both federal claims and pendant state law claims. *Id.* at 49. The present case involved only New York claims, which were tried in this Court based solely upon diversity of citizenship. Further, it does not appear that the court in *Greenway* was directly faced with the issue of which interest rate to apply. *See id.* at 55 ("[Defendant] does not dispute that plaintiff is entitled to post-judgment interest on his award, but does question the date from which that interest should be calculated.") District courts in this Circuit have reached divergent results when faced with this issue.[9]

■ For the following reasons, this Court finds that post-judgment interest shall be calculated at the rate established by 28 U.S.C. § 1961. First, the plain language of the statute indicates that it applies to "*any* money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a) (emphasis added). Congress elected not to make an exception for judgments recovered in diversity cases. Second, every circuit court to address this issue has concluded that the federal rate applies to all money judgments recovered in civil cases, including diversity cases. *See Forest Sales Corp. v. Bedingfield,* 881 F.2d 111, 111–13 (4th Cir.1989); *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.,* 848 F.2d 613, 622 (5th Cir.1988); *Bailey v. Chattem, Inc.,* 838 F.2d 149, 152–53 (6th Cir.1988); *Travelers Ins. Co. v. Transport Ins. Co.,* 846 F.2d 1048, 1053–54 (7th Cir. 1988); *Weitz Co., Inc. v. Mo–Kan Carpet, Inc.,* 723 F.2d 1382, 1385–86 (8th Cir.1983); *Northrop Corp. v. Triad Int'l Marketing,*

---

**8.** The parties do not dispute that the pre-judgment interest rate is governed by New York law. This is in accord with Second Circuit case law. *See, e.g., Campbell v. Metro. Prop. and Cas. Ins. Co.,* 239 F.3d 179, 186–87 (2d Cir.2001).

**9.** The following courts applied the New York interest rate: *Kaledioscope Media Group, Inc. v. Entm't Solutions, Inc.,* No. 97–CIV–9396, 2001 WL 849532, at *5 (S.D.N.Y. July 19, 2001); *DVCi Technologies, Inc. v. Timessquaremedia.com, Inc.,* No. 00–CIV–0207, 2000 WL 33159189, at *3 (S.D.N.Y. Nov. 29, 2000);

*Avildsen v. World Wide Entm't Corp.,* No. 81–CIV–3462, 1994 WL 529755, at *1 (S.D.N.Y. Sept. 29, 1994); *Purgess v. Sharrock,* No. 91–CIV–0621, 1993 WL 426524, at *1 (S.D.N.Y. Oct. 19, 1993). These courts applied the federal interest rate: *Cayuga Indian Nation of New York v. Pataki,* 188 F.Supp.2d 223, 243 & n. 6 (N.D.N.Y.2002); *Caruolo v. AC & S,* No. 93–CIV–3752, 2001 WL 125678, at *2 (S.D.N.Y. Feb. 13, 2001); *Arnold v. County of Nassau,* 89 F.Supp.2d 285, 308 (E.D.N.Y. 2000), *vacated on other grounds,* 252 F.3d 599 (2d Cir.2001).

*S.A.*, 842 F.2d 1154, 1155–56 (9th Cir. 1988); *Everaard v. Hartford Acc. and Indem. Co.*, 842 F.2d 1186, 1193–94 (10th Cir.1988); *G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1542 (11th Cir.1985).

 Finally, this Court finds Plaintiffs' *Erie* doctrine arguments unavailing. These arguments were fully analyzed by the Eighth Circuit in *Weitz*, the Fifth Circuit in *Nissho–Iwai*, and the Fourth Circuit in *Forest Sales*. This Court is in full agreement with the analysis and conclusions of those courts. In particular, this Court notes the Eighth Circuit's determination that post-judgment interest is "a subject with respect to which Congress has full power to legislate, even as to cases that get into the federal courts only because of diversity of citizenship." *Weitz*, 723 F.2d at 1386. Further, this Court concurs with the Fourth Circuit's finding that "the plain language of the text, the legislative history, and the policy expressed in the statute" all support the conclusion that post-judgment interest in diversity actions is governed by federal law. *Forest Sales*, 881 F.2d at 113.

### CONCLUSION

For the foregoing reasons, this Court will not revisit its February 28, 2003 Decision and Order. However, this Court does find that Defendants are entitled to present expert testimony regarding Howard Underwood's future social security disability benefits. Further, this Court finds that the post-judgment interest rate shall be determined according to 28 U.S.C. § 1961.

### ORDERS

IT HEREBY IS ORDERED that Defendant Bucyrus' Motion for Reconsideration (Docket NO. 281) is DENIED.

FURTHER, that Defendant Iroquois' Motion for Reconsideration (Docket NO. 285) is DENIED.

FURTHER, that Defendants shall be permitted to introduce expert testimony regarding Howard Underwood's future social security disability benefits.

FURTHER, that post-judgment interest shall be determined according to 28 U.S.C. § 1961.

SO ORDERED.